Filed 7/6/22  P. v. Palacios CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B310844 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.BA465253) |
| v. | |
| ANDREW PALACIOS et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Mark S. Arnold, Judge.  Affirmed in part, reversed in part, and remanded with directions.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant Andrew Palacios.

Heather J. Manolakas, under appointment by the Court of Appeal, for Defendant and Appellant Jimmy Perez.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr. and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

A jury convicted Andrew Palacios of the murder of Daniel Duarte (Pen. Code,[1] § 187, subd. (a)).  It also convicted him of the premeditated, willful and deliberate attempted murder of D.G. (§§ 664/187, subd. (a)) and possession of a handgun by a prohibited person (§ 29800, subd. (b)).

The same jury convicted Jimmy Perez of the willful, deliberate and premeditated attempted murder of D.G. and possession of a firearm by a felon (§ 29800, subd. (a)(1)).  The jury acquitted Perez of the murder of Daniel Duarte.[2]  The jury found true numerous gang and non-gang related enhancements for both defendants.  We discuss those in more detail in Section V.

Both defendants appeal their convictions.  Palacios contends the trial court erred in declining to instruct the jury on imperfect self-defense for the murder and attempted murder counts.  For his part, Perez contends the evidence is insufficient to support his conviction of attempted murder.  He also contends the trial court improperly admitted against him statements Palacios made to an undercover *Perkins* agent.[3]  All parties filed supplemental briefing on whether newly enacted Assembly Bill No. 333 requires us to vacate and remand for retrial the gang and firearm enhancements.  We affirm the underlying convictions and the non-gang-related firearm findings.  We vacate and remand for retrial the gang enhancement findings and the gang-related

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     We note the abstract of judgment for Perez incorrectly states he was convicted of murder, not attempted murder.  We direct the trial court upon remand to issue a corrected abstract of judgment.

[3]     *Illinois v. Perkins* (1990) 496 U.S. 292.

firearm enhancement findings.  We also direct the trial court to correct Perez's abstract of judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 21, 2018, victims Daniel Duarte and D.G. lived near each other in a homeless encampment in "The Wash," an area at Avenue 52 and Figueroa Street near the 110 Freeway corridor in Los Angeles.  Around 2:00 a.m., Duarte went to D.G.'s makeshift shelter/tent so the two of them could smoke methamphetamine together.  Duarte was on his knees with his back to the door, rooting around in his backpack for his lighter, when two men came into the shelter.  One of the men (appellant Palacios) stood about one foot from Duarte as Duarte continued to look for his lighter.  Palacios was the first person to enter the tent with appellant Perez following behind him.  Palacios entered with gun drawn; Perez was openly armed with his gun pointed at the ground.

Palacios asked the victims where they were from, that is, what was their gang.  Still on his knees, unarmed, and with his back to Palacios, Duarte said he was from "la Pasadena."  D.G. said he was "paisa," meaning he had no gang affiliation.  Immediately and suddenly Palacios shot Duarte.  Palacios then pointed the gun at D.G. and shot him behind the left ear.  D.G. also felt a second shot, but was not sure who fired it.  D.G. fell bleeding onto his bed and pretended to be dead.  Palacios shouted "Avenues" (the name of a local gang) and the two men left the tent.  D.G. continued to play dead for five minutes.

Leaving a trail of blood in his wake, D.G. stumbled out of the tent to look for help and found a friend who called 911.  At 5:10 a.m. D.G. was aided by paramedics who took him to the

3

hospital.  Police arrived while he was being treated by the paramedics.  D.G. told the police there was another victim who had been shot with him about 10 minutes earlier.  Police found Duarte, in a pair of shorts and a black hoodie, dead in the tent as a result of a gunshot wound to his head.  The bullet traveled from the back to the front of his head.  No weapons were found in the shelter.  However, two 9-millimeter cartridge casings were discovered at the scene.

Over the next few days, D.G. identified Palacios from a photo spread.  Palacios was arrested and placed in a jail cell with a paid confidential informant, also called a *Perkins* agent.  In a monitored conversation, Palacios told the informant he was a member of the Avenues gang, his moniker was "Flaps" and he had 9-millimeter ammunition at his house.  Palacios also said he and his companion "Husky" had gone to The Wash to look for enemies, that is, rival gang members.  They were walking along the freeway, went into a tent, and found some "bums."  Palacios indicated "boom boom boom" and said he shot two people in the tent.  He said the gun he used was across the street from his house at his aunt's house.  A 9-millimeter Beretta was later recovered from the aunt's house.  The casings in evidence from the scene were fired from that Beretta.

At Palacios's house police recovered 9-millimeter ammunition and a baseball cap with the letter "A," a kind of cap often worn by members of the Avenues, one of the main gangs in the neighborhood where the shooting occurred.  Also recovered from a nearby 7-Eleven one block from The Wash was a video surveillance tape showing two men in the store at 1:00 a.m. on January 21, 2018, four hours before the shooting.  Police identified the two men as appellants.

4

Police determined that "Husky" was a moniker used by Perez and created a photospread which included his photo. At trial a gang officer testified that on a prior occasion, Perez had said his gang moniker was "Husky." D.G. later identified Perez from the photospread as "kind of" looking like the second person who entered the tent. Perez's home was searched and two hats and a belt buckle, each with an "A" on it, were found in his bedroom.

## DISCUSSION

I. **The Trial Court Properly Refused to Instruct on Imperfect Self Defense for the Murder and Attempted Murder Counts as to Palacios**

Palacios requested instructions on manslaughter, attempted manslaughter, and imperfect self-defense. He contended he shot the victims in imperfect self-defense, that is, under an actual good faith but unreasonable belief that he was in imminent danger of great bodily injury or death. The theory of unreasonable, or imperfect, self-defense reduces murder to the lesser included offense of voluntary manslaughter because it negates the requisite mental element of malice. (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708; *In re Christian S.* (1994) 7 Cal.4th 768, 783; CALCRIM No. 571 ["A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense."].)

The trial court is required to instruct a jury on all general principles of law raised by the evidence, whether or not the defendant makes a formal request. (*People v. Avila* (2009) 46 Cal.4th 680, 704.) This includes a sua sponte duty to instruct

on all lesser necessarily included offenses supported by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 148–149.) However, the evidence that will justify a conviction on a lesser offense must be substantial, that is, evidence a reasonable jury could find persuasive and from which the jury could reasonably conclude the defendant was not guilty of the charged offense but only of the lesser-included offense. (*People v. Rogers* (2006) 39 Cal.4th 826, 866–867.) Put another way, the instruction is warranted when the evidence is substantial that the defendant killed in unreasonable self-defense, "not when the evidence is 'minimal and insubstantial.' " (*People v. Barton* (1995) 12 Cal.4th 186, 201.) The trial court is not required to present theories the jury could not reasonably find to exist. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 78.)

We review de novo the trial court's failure to instruct on a lesser included offense, reviewing the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137; *People v. Oropeza, supra,* 151 Cal.App.4th at p. 78.)

In support of his request, Palacios argued that when he entered the shelter, it was very dark as only two flashlights illuminated the interior of the tent. As Palacios entered, Duarte was on his knees in front of Palacios with his back to him. Duarte's hands were in front of him and at one point he twisted his body to look up at Palacios. Palacios argued the instruction on imperfect self-defense was warranted because it was dark and he could not see what Duarte was doing with his hands, causing him to fear for his safety.

The trial court denied the request, explaining that a lesser instruction on manslaughter had to be supported by substantial

6

evidence such that the jury could find the defendant guilty of manslaughter, not murder. The trial court noted there was no evidence Palacios honestly believed he had to resort to self-defense. The court observed Palacios never said, when he described the events of that night to the *Perkins* agent, that he thought the victim was going for a weapon.

The trial court properly declined to give the requested instructions. There was no substantial evidence that Palacios held an honest belief he had to shoot Duarte and D.G. to defend himself. To begin with, there was never any indication that Duarte or D.G. were armed when Palacios and Perez entered D.G.'s tent and Palacios asked the victims where they were from. The coroner testified Duarte did not have any firearms or knives on his person. Neither was there evidence Duarte or D.G reached for anything that could be construed as a weapon. Duarte was searching through his backpack for his lighter when Palacios and Perez entered the tent with guns already and openly drawn. That Duarte had his hands in his backpack apparently did not prompt Palacios, upon entry, to immediately fire out of fear. Indeed, Palacios did not raise his gun to fire until after he issued a gang challenge and learned Duarte was from a Pasadena gang. His victims neither presented weapons nor attempted to use force. Duarte never even faced his assailants as he was still rooting around in the backpack when Palacios shot him.

Most significantly, Palacios was the aggressor from the very start. He entered the tent with a drawn gun and an openly armed companion. He issued the gang challenge and then immediately and without warning fired at the victims after hearing their answers. Even if the victims had attempted to use force, Palacios's own conduct created the very situation he

7

allegedly found life-threatening.  He cannot now claim his adversaries' conduct mitigated the shooting.  (*People v. Enraca* (2012) 53 Cal.4th 735, 761 [imperfect self-defense may not be invoked by a defendant whose own wrongful conduct created the circumstances that caused his adversary to use force]; *People v. Seaton* (2001) 26 Cal.4th 598, 664 [where defendant was the initial aggressor and victim's response was legally justified, defendant could not rely on unreasonable self-defense].)

Palacios argues the trial court drew unfavorable conclusions from his statements to the *Perkins* agent, instead of viewing the evidence in the light most favorable to him.  Paying no heed to statements Palacios made to the *Perkins* agent still leaves in play the evidence we have recounted, which is not sufficient to warrant the instructions Palacios requested.  The trial court did not err in declining to instruct the jury on imperfect self-defense, manslaughter, or attempted manslaughter.

II.  **The Evidence was Sufficient to Support Perez's Conviction of Attempted Murder**

Perez argues the evidence presented at trial was insufficient to support his conviction of attempted murder.  He argues two grounds: 1) the identification evidence was too weak to place him at the scene; and 2) if he was the second person in the tent, there was no proof he acted with knowledge of Palacios's criminal purpose and with an intent or purpose either of committing, encouraging, or facilitating commission of the offense.  Perez argues that because neither victim was a rival gang member and he and Palacios were out hunting rival gang members only, he did not share Palacios's intent when Palacios pulled the trigger on the non-rival victims.

8

" ' "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212—1213 (*Rangel*).) This court neither reweighs the evidence nor reevaluates the credibility of witnesses. (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 521.) And juries may accept all, part, or none of a witness's testimony. (*People v. Collins* (2021) 65 Cal.App.5th 333, 345.)

Unless the testimony is physically impossible or inherently improbable, the testimony of a single eyewitness may be sufficient to prove the defendant's identity as the perpetrator of a crime. (*People v. Young* (2005) 34 Cal.4th 1149, 1181; Evid. Code, § 411.) Furthermore, the identification may be tentative. (*People v. Primo* (1953) 121 Cal.App.2d 466, 468.) A reviewing court can set aside a jury's finding of guilt only if the evidence of identity is so weak as to constitute practically no evidence at all. (*People v. Braun* (1939) 14 Cal.2d 1, 5.) The reviewing court also presumes in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1263.) Before setting aside the judgment

9

of the trial court for insufficiency of the evidence, it must clearly appear there was no hypothesis whatsoever upon which there was substantial evidence to support the verdict. (*People v. Conners* (2008) 168 Cal.App.4th 443, 453; *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

        A.    *The Identification Evidence*

Victim D.G. and appellants provided the identification evidence linking Perez to the shootings.

In his conversation with the undercover informant, Palacios identified himself as a member of the Avenues and identified "Husky" as his "homie" from the Avenues who went "hunting" with him into The Wash and the tent.

Law enforcement took the name "Husky" and identified Perez as the only member of the Avenues they knew of with that moniker. They then put Perez's photo in a six-pack photospread which was shown to D.G. D.G. chose Perez's photograph out of the six-pack because appellant looked most like his assailant, despite having a "slightly different face." When D.G. was asked to identify his assailant in court, he identified Perez. Perez also confirmed in an earlier encounter with police that his gang moniker was "Husky." D.G. testified he feared the Avenues because it was a very strong gang whose members could come after him or his family.

We conclude D.G.'s identification of Perez as the second man in the tent, however tentative, was sufficient to support the verdict. Also supporting the verdict is Palacios's identification of his crime partner that night as his homie with the moniker "Husky" and Perez's prior statement that he was known as "Husky." We do not view this combination of facts as so weak as to constitute practically no evidence at all. (*People v. Braun*,

10

*supra*, 14 Cal.3d at p. 5; *People v. Jackson* (1960) 183 Cal.App.2d 562, 567.) That a different jury may have viewed the evidence in a different light is no ground to accept Perez's invitation to overturn the verdict. "[W]hen two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the jury. It is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion." (*People v. Brown* (1984) 150 Cal.App.3d 968, 970; see also *People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

B. *Shared Intent*

To prove that a defendant is an accomplice the prosecution must show that the defendant acted " ' "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." ' " (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118; see also *People v. Beeman* (1984) 35 Cal.3d 547, 560.) When the offense charged is a specific intent crime, the accomplice must share the specific intent of the perpetrator; this occurs when the accomplice knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime. (*McCoy*, at p. 1118.) Perez argues there is no evidence that he shared Palacios's intent to murder Duarte and D.G. because, as it turned out, neither victim was a member of rival gangs they were hunting that night. Instead, the victims were homeless men.

We do not agree that this fact exonerates Perez. The testimony by the gang experts established that as gang members Palacios and Perez shared an interest in burnishing the reputation of their own gang, the Avenues. According to

11

Palacios, they were hunting for "enemies" as they walked through The Wash, entering multiple tents and looking for rivals. They displayed their weapons openly as they entered D.G.'s shelter. Upon entering, Palacios immediately issued a gang challenge by asking where the victims were from and then immediately responded to their answers by shooting Duarte point black in the back of the head. He then turned to D.G. and shot him in the neck and arm. After the shooting Palacios yelled "Avenues" and the two men left the tent together.

Perez's armed presence in the tent no doubt offered Palacios support and encouragement in the "hunt" that night. The evidence establishes Palacios and Perez had one joint goal in entering that tent – to further the interests of their gang – and that included committing acts of violence for which their gang could take credit, enhancing its reputation. That the two victims were not members of a specifically targeted rival gang is not material. Appellants entered the tent openly armed and ready to shoot for the glory of their gang. The evidence was sufficient to support Perez's conviction of attempted murder.

III. **Admission of Statements Palacios Made to the *Perkins* Agent Did Not Violate Perez's Right to Confront Witnesses under the Confrontation Clause**

Perez contends his constitutional right to confront witnesses was violated when the trial court admitted statements Palacios made to the jailhouse informant which incriminated Perez. We disagree.

After Palacios was arrested, he was placed in a jail cell with a *Perkins* agent – an informant who is jailed with an arrestee for the purpose of eliciting incriminating information from the arrestee. When they met, Palacios introduced himself

12

as "Flaps" from the Avenues.  The *Perkins* agent identified himself to Palacios as a 45-year-old from Riverside arrested for a double murder.  Palacios told the agent he was 19.  The conversation between the *Perkins* agent and Palacios was audio-recorded and monitored in real time by Officer Manriquez.  As described by Officer Manriquez, he and his partner would go into the "tank and introduce something to stimulate the conversation between the *Perkins* agent and the arrestee."

And, indeed, that is what happened in this case.  Fourteen minutes into the conversation, Detective Alfaro entered the cell briefly to tell Palacios that the detectives have a video they want to show him and that one of the victims of the shooting survived and said he had a flashlight on Palacios.  At 47 minutes, Detective Alfaro opens the cell door and makes a comment about a "nine millimeter" to an unidentified male in the background.  He then tells Palacios he is going to question Palacios's brother first.  After Alfaro leaves the cell, the *Perkins* agent picks up the thread and tells Palacios the police are looking for the murder weapon, intend to "sweat" Palacios's brother "real bad" and accuse him of the murder, and keep his brother until he says something.

Palacios ends up telling the *Perkins* agent that he has ammunition at his house and has hidden the weapon the police are looking for in a place his "little cousin" knows about.

Again, police return to take photos of the *Perkins* agent.  Palacios is allowed to leave the cell to use the restroom.  After they leave, the *Perkins* agent begins a discussion with Palacios about photographs, DNA, and swabbing.  Soon the detectives return to tell Palacios they have a lot of evidence and one person survived and told them "a lot."  "We know exactly what happened

in there.  And there's no denying it."  They tell Palacios that even though he placed himself at the scene in his prior statement to police, "your story from what happened inside that tent is not quite there."  They take a DNA swab and leave.

The *Perkins* agent follows up and asks Palacios incredulously, "Damn, what happened?  You told him you were there?  I didn't know that."  Palacios then states he knew the murder victim; "The homie" just went in there and did it for the "fuck of it";  after the shooting, he took the weapon and his homie took the bullets; his homie is still on the streets;  the weapon was in his cousin's house; only two people were in the tent;  he was in fact in the tent that night; they went into the tent and "boom, boom, boom"; he asked the victim where he was from before shooting; he and his homie both had guns; they were in The Wash looking among the bums for their enemies, the Highland Park gang; he put one bullet in each of the victims; the victims got one bullet in the head; the murder occurred at 5:00 a.m.; he and his homie were partying that night and then his homie insisted on going hunting when Palacios just wanted to go home.

Towards the end of the conversation the *Perkins* agent offers to get the word out to the homie to be careful and he asks for his name.  Palacios answers: "Husky."

In sum, the *Perkins* operation elicited the following information from Palacios: 1) Palacios is a member of the Avenues gang and is known as "Flaps" 2) he was accompanied to the homeless encampment by his fellow gang member, whose moniker is "Husky"; 3) "Husky" had not yet been arrested to his knowledge; 4) he and Husky were "hunting" rival gang members as they went through the homeless encampment; 5) both of them

entered the tent and only Palacios shot the victims; 6) alternatively "Husky" shot the victims.

The Sixth Amendment's Confrontation Clause provides that, " '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' " (*Crawford v. Washington* (2004) 541 U.S. 36, 42 (*Crawford*); *People v Lopez* (2012) 55 Cal.4th 569, 576.) When a codefendant's confession implicates the defendant and is introduced into evidence at their joint trial, a potential constitutional violation arises. If the codefendant invokes the Fifth Amendment right against self-incrimination and declines to testify at trial, the implicated defendant is unable to cross-examine him about the contents of his prior statement. Thus, as set out in *People v. Aranda* (1965) 63 Cal.2d 518, 528–530, abrogated in part by Cal. Const. art. 1, §28, subd. (d) and *Bruton v. United States* (1968) 391 U.S. 123, 126, a defendant is deprived of the Sixth Amendment right to confront witnesses when a facially incriminating statement of a non-testifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the statement only against the co-defendant declarant. This is the *Aranda/Bruton* rule.

Decades later, the United States Supreme Court and our own Supreme Court limited the application of the *Aranda/Bruton* rule to testimonial statements only. (*People v. Cortez* (2016) 63 Cal.4th 101, 129; *Crawford, supra*, 541 U.S. at p. 53 [Sixth Amendment right of confrontation applies to testimonial statements only].) The Court reasoned that the right of confrontation extends only to "witnesses" against a defendant and witnesses are those who "bear testimony." "Testimony" is typically a solemn declaration or affirmation made for the

purpose of establishing or proving some fact.  Thus, a testimonial statement is one the declarant would reasonably expect to be used prosecutorially or a statement made under circumstances which would lead an objective witness reasonably to believe the statement would be available for use at a later trial.  (*Crawford*, at pp. 51–52.)

Although *Crawford* did not precisely define "testimonial," it did describe types of statements that constitute a "core class" of testimonial statements.  (*Crawford*, *supra*, 541 U.S. at p. 51.) These include functional equivalents of in-court testimony, such as affidavits and similar pretrial statements " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' "  (*Id*. at pp. 51–52.)  As the California Supreme Court summarized, "the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial."  (*People v. Cage* (2007) 40 Cal.4th 965, 984.)

"Generally speaking, a declarant's hearsay statement is testimonial if made 'with a primary purpose of creating an out-of-court substitute for trial testimony.'  (*Michigan v. Bryant* (2011) 562 U.S. 344, 358 [179 L.Ed.2d 93, 131 S.Ct. 1143].) Notwithstanding the lack of a comprehensive definition of 'testimonial' (*Ohio v. Clark* (2015) 576 U.S. 237, 242 [192 L.Ed.2d 306, 135 S.Ct. 2173, 2179]), the high court has nonetheless emphasized that only hearsay statements that are 'testimonial' are subject to the confrontation clause."  (*People v. Fayed* (2020) 9 Cal.5th 147, 168 (*Fayed*).)

*Davis v. Washington* (2006) 547 U.S. 813 (*Davis*) explained how statements qualify as "testimonial": "Statements are

16

nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id*. at p. 822.)  Later, in *Michigan v. Bryant*, the Supreme Court explained how to determine the "primary purpose" of an "interrogation."  In "addition to the circumstances in which an encounter occurs, the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." (*Michigan v. Bryant, supra,* 562 U.S. at pp. 359, 367.)

In *Rangel*, our Supreme Court summarized *Crawford* and its aftermath: "*Crawford* held that, in general, admission of 'testimonial' statements of a witness who was not subject to cross-examination at trial violates a defendant's Sixth Amendment right of confrontation, unless the witness is unavailable and the defendant had a prior opportunity for cross-examination.  (*Crawford*, [*supra*, 541 U.S.] at pp. 59–60, 68.)" (*Rangel, supra,* 62 Cal.4th at p. 1214.)  *Rangel* acknowledged that although *Crawford* did not offer an exhaustive definition of "testimonial statements," the Supreme Court had since clarified that a statement cannot fall within the Confrontation Clause unless its primary purpose was to establish or prove past events potentially relevant to later criminal prosecution.  (*Rangel,* at p. 1214.)  It also acknowledged that the primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause.  (*Ibid*).

17

Under the test, statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers. A court also considers the formality "of the situation and the interrogation" in determining the primary purpose of a challenged statements. In the end, the question is whether, in light of the circumstances, viewed objectively, the primary purpose of the conversion was to create an out-of-court substitute for trial testimony. (*Id.* at pp. 1214–1215.)

Here there can be no question that the primary purpose of the interchange between the *Perkins* agent and Palacios was to create evidence for use at a subsequent prosecution. The agent was used to elicit information from Palacios about the offenses; the conversation was recorded (and, indeed, played for the jury at trial). The conversation was interrupted when detectives would enter the cell to "disclose" to Palacios information about the investigation to date or to make comments the *Perkins* agent could use to spark more conversation about the offenses. And no party claims the conversation was part and parcel of an emergency situation or necessary for some other non-prosecutorial purpose.

Nevertheless, if satisfying the primary purpose test is necessary but not always sufficient to characterize a statement was "testimonial," what factor trumps the test? *Crawford* and *Davis* both focus on the expectations of the declarant in determining whether a statement is testimonial. *Davis* states a statement is "clearly non-testimonial" where the speaker had no expectation that their statements would be used at a subsequent trial, such as when the speaker was talking to a fellow inmate or

co-conspirator or was unaware they were talking to an informant. (*Davis*, *supra*, 547 U.S. at p. 825.)  *Crawford* cites with approval *Bourjaily v. United States* (1987) 483 U.S. 171, 173–174, where the court found non-testimonial a co-defendant's unwitting statements to an informant which incriminated the defendant and were admitted against him at trial.  (*Crawford*, *supra*, 541 U.S. at p. 58; *People v. Dalton* (2019) 7 Cal.5th 166, 209 [statement to a fellow inmates is not testimonial within the meaning of *Crawford*]; *Fayed*, *supra*, 9 Cal.5th at p. 169 [same]; *People v. Gallardo* (2017) 18 Cal.App.5th 51, 67 (*Gallardo*) [statements made to wired informants are not testimonial because declarant had no belief that his statements were being monitored and would be used in a subsequent trial]; *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1402 [same].)

Under the authorities cited above, we hold that admission of Palacios's statements to the *Perkins* agent implicating Perez in the offenses does not violate the Confrontation Clause as Palacios's oblivious statements to the *Perkins* agent were not testimonial.  Based on objective circumstances, no reasonable person in Palacios's position would have believed his statements would be introduced at a later prosecution.  (*Gallardo*, *supra*, 18 Cal.App.5th at pp. 67–69 [statements were nontestimonial because, regardless of informant's intent in asking the question, there was no evidence defendant knew or suspected the informant was a government agent or that his comments might be used at trial].)  The trial court did not err in admitting Palacios's statements about Perez to the *Perkins* agent.

Finally, Perez argues that "to hold that the confrontation clause does not prevent the police from using a paid agent to obtain the information on their behalf when the police are in fact

directing the interaction completely eviscerates the confrontation clause and the approach dictated by the United States Supreme Court in evaluating the primary purpose of such interrogation. The police should not be able to pay non-law enforcement personnel to void a defendant's constitutional rights." We draw on three United States Supreme Court decisions as the touchstones for our holding: *Davis, Crawford*, and *Bourjaily*.

IV. **Assuming the Trial Court Committed Error in Admitting Palacios's Statement to the *Perkins* Agent, the Error was Harmless.**

Alternatively, Perez contends that statements made by Palacios to the *Perkins* agent about "Husky" are inadmissible hearsay. The trial court disagreed and found them admissible as declarations against penal interest. We review a trial court's evidentiary rulings for abuse of discretion. (*People v. Grimes* (2016) 1 Cal.5th 698, 711.) Error in admitting a statement or failing to excise it is reviewed under the harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Duarte* (2000) 24 Cal.4th 603, 618–619.) Assuming error, we conclude it is harmless.

At first, Palacios denied all culpability. Then he revealed the murder weapon was stashed at his aunt's house. After being called out twice by the detectives and told the police had incriminating videotape, he returned and pondered aloud to the *Perkins* agent how he would defend himself if he had been taped. Then he describes that he shot his gun at the victims with a "boom boom boom."

Palacios then states it was his cousin's idea to go "hunting" for rival gang members and all he wanted to do was go home after partying all night. At one point he says his "homie" was the

20

shooter, not him. Then he gives up his not-yet-arrested homie's name – Husky—when the *Perkins* agent suggests that he himself will help get word to Husky to keep quiet or leave town.

We find the error harmless under *People v. Watson*. D.G.'s identifications of Perez in the photospread and then in court do not make it reasonably probable that a result more favorable to Perez would have been reached in the absence of the error. (*People v. Valencia* (2021) 11 Cal.5th 818, 840.)

V. **Assembly Bill No. 333 Compels Remand and Retrial of the Gang Enhancements and Gang-Related Firearm Enhancements**

The jury found true several gang and firearm enhancements as to Palacios. It found the murder was committed for the benefit of a street gang and to promote and assist criminal conduct by gang members in violation of section 186.22, subdivisions (b)(1)(C) and (e)(1). Further it found Palacios personally used a handgun, personally and intentionally discharged a handgun, and personally and intentionally discharged a handgun which caused Duarte's death, all in violation of section 12022.53, subdivisions (b), (c), and (d). It also found that a principal had personally used a handgun, personally and intentionally discharged a handgun and personally and intentional discharged a handgun proximately causing death to Duarte while committing a crime to benefit a street gang in violation of section 12022.53, subdivisions (b)-(d) and (e)(1).

As for the attempted murder of D.G., the jury found it was committed for the benefit of and to promote criminal activity by a street gang in violation of section 186.22, subdivisions (b)(1)(C) and (b)(5). Again, the jury found a principal personally used, personally and intentionally discharged, and personally and

21

intentionally discharged a handgun which proximately cause great bodily injury to D.G. while acting for the benefit of a street gang in violation of section 12022.53, subdivisions (b)-(d) and (e)(1).  As to the possession count, the jury found it was committed for the benefit of a street gang in violation of section 186.22, subdivision (b)(1)(A).

The jury also rendered findings as to Perez.  The jury found both crimes were committed for the benefit of and to promote criminal activity by a street gang in violation of section 186.22, subdivisions (b)(1)(A) and (b)(1)(C).  As to the attempted murder, the jury found a principal personally and intentionally discharged a firearm which proximately caused great bodily injury to D.G. while committing a crime to benefit a street gang, in violation of section 12022.53, subdivisions (d) and (e)(1).

The findings can be divided into three categories:  gang allegations under section 186.22; gang-related firearm enhancements under 12022.53, subdivisions (b)-(d) and (e)(1); and non-gang related firearm enhancements under section 12022.53, subdivisions (b), (c), and (d).

The parties filed supplemental briefing addressing the impact of newly enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333) on the gang enhancements.  (See Stats. 2021, ch. 699, §§ 1–5.)  Assembly Bill 333 amends section 186.22 to require proof of additional elements to prove a gang enhancement.  (Assem. Bill No. 333, § 3, amended § 186.22, eff. Jan. 1, 2022.)

Appellants assert that under the new law, there is no evidence to support imposition of the gang enhancements under sections 186.22 and 12022.53, subdivisions (b) and (e)(1), (c) and (e)(1), and (d) and (e)(1).  They ask us to vacate the true findings

on these allegations and remand the matter for retrial, at the election of the People.

The People argue substantial evidence was presented to support the gang enhancements, even under the amended statute, and thus remand would be an idle act. We conclude the gang enhancement and gang-related firearm findings must be vacated and remanded for retrial.

### A. *Retroactivity*

We agree with the parties that Assembly Bill 333 applies retroactively to appellants' gang enhancements. In *In re Estrada* (1965) 63 Cal.2d 740, 744–746, the California Supreme Court held that, absent evidence to the contrary, the Legislature intended amendments to statutes that reduce punishment for a particular crime to apply to all whose judgments are not yet final on the amendments' operative date. (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307–308; *People v. Brown* (2012) 54 Cal.4th 314, 323.) This principle also applies when an enhancement has been amended to redefine to an appellant's benefit the conduct subject to the enhancement. (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 68, 70–71 (*Figueroa*).) As Assembly Bill 333 increases the threshold for conviction of section 186.22 offenses, we agree with the parties that appellants are entitled to the benefit of this change in the law. "[A] defendant is entitled to the benefit of an amendment to an enhancement statute, adding a new element to the enhancement, where the statutory change becomes effective while the case was on appeal, and the Legislature did not preclude its effect to pending cases." (*Figueroa*, at p. 68.)

B. *Statutory Framework and Impact of Assembly Bill 333*

Section 186.22 provides for enhanced punishment when a person is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

Assembly Bill 333 altered the requirements for proving the "pattern of criminal gang activity" necessary to establish the existence of a criminal street gang. Before Assembly Bill 333 became effective, a "pattern of criminal gang activity" meant "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (§ 186.22, former subd. (e).) As of the effective date, Assembly Bill 333 redefines "pattern of criminal gang activity" to require that the last of the predicate offenses "occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed," and that the predicate offenses "were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational." (Assem. Bill No. 333, § 3; amended § 186.22, subd. (e)(1), eff. Jan. 1, 2022.) In addition, the currently charged offense cannot be used as a predicate offense under the amendments. (§ 186.22, subd. (e)(2).)

24

Thus, pursuant to the new legislation, imposition of a gang enhancement requires proof of the following additional requirements with respect to predicate offenses: (1) the offenses must have "commonly benefited a criminal street gang" where the "common benefit . . . is more than reputational"; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense. (Assem. Bill No. 333, § 3, amended § 186.22, subd. (e)(1)–(2), eff. Jan. 1, 2022.) With respect to common benefit, the new legislation explains: "[T]o benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (Assem. Bill No. 333, § 3, amended § 186.22, subd. (g), eff. Jan. 1, 2022.)

Putting aside whether the People did submit evidence of two predicate offenses committed within the new time frame, the People did not prove that the predicate offenses commonly benefitted a criminal street gang in a way that was more than reputational. The People did not address this last point in their supplemental briefing. Reputational benefit was, nonetheless, the theoretical linchpin of the People's case as to the gang allegations. Their gang expert testified about how the charged crimes benefited the Avenues street gang: "It goes to the violent reputation that this gang has, enhancing that violent reputation

25

which contributes to create this atmosphere of fear and intimidation which have a stronghold on the individuals who live within the territory that they claim or work within the territory that the Avenues criminal street gang claims, which makes them hesitant to come forward to crimes that they witnessed to police or coming to court and testify in court against them for fear of retaliation knowing that this gang is so violent in nature."

The People's closing argument elaborated on the theme of reputational benefit: "The purpose of them committing both those crimes was to demonstrate that deadly power that benefits the Avenues gang. They want to benefit the Avenues territory over an area that is a narcotics area where they're going to make money off of taxing dealers or some of the homies, people that are using there. And they're both looking to enhance the reputation, not only the Avenues gang, but the reputation inside the gang as well."

At the time of this trial, the People could prove that the charged offenses benefitted a criminal street gang merely by showing that the offenses enhanced the reputation of the gang. (*People v. Albillar* (2010) 51 Cal.4th 47, 63.) Assembly Bill 333 changed all that by specifically mandating that a showing of reputational benefit is insufficient to prove the allegation.

Additionally, the jury was not prohibited from relying upon the currently charged offenses in determining whether a pattern of criminal gang activity had been proven. Nor was the jury instructed on these new requirements. Appellants have a constitutional right to a jury instructed on every element of the charged enhancement. (*People v. Ramos* (2016) 244 Cal.App.4th 99, 104; *Figueroa*, *supra*, 20 Cal.App.4th at p. 71.) Thus, the jury was not asked to, and therefore did not, make the actual

26

determinations that are now required by the amendments to section 186.22. We therefore conclude that the gang-related enhancement findings must be vacated and the matter remanded to give the People the opportunity to prove up all the elements of the enhancements under the amendments to section 186.22.

Assembly Bill 333's changes to section 186.22 affect not only the gang enhancement allegations under that statute but other statutes that expressly incorporate provisions of section 186.22. Here, one other statute specifically referring to section 186.22 is implicated: section 12022.53, subdivision (e)(1).

Section 12022.53 provides for sentence enhancements for the use of firearms in the commission of an enumerated felony. The statute first provides for escalating punishments depending on how the firearm is used. The least severe penalty is set forth in section 12022.53, subdivision (b), which provides for a consecutive 10-year term for a defendant who "personally uses" a firearm in a felony. Next, a consecutive 20-year term is imposed under section 12022.53, subdivision (c), if the defendant "personally and intentionally discharges a firearm" in the commission of the offense. Finally, section 12022.53, subdivision (d) provides for a consecutive sentence enhancement of 25 years to life when the defendant "personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death" during the commission of the offense.

While these subdivisions provide punishment for offenders who personally use a firearm during the commission of their crimes, the penalties may also be imposed under subdivision (e)(1) where a principal in the offense acts under certain gang-related circumstances: First, the person who is a principal must be "convicted of a felony committed for the benefit of, at the

27

direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" as set forth in section 186.22, subdivision (b). (§ 12022.53, subd. (e)(1)(A).) Second, "[a]ny principal in the offense" must have "committed any act specified in subdivision (b), (c), or (d)," that is, any principal involved in the offense must have personally used a firearm in the escalating use categories provided in section 12022.53, subdivisions (b) through (d). (§ 12022.53, subd. (e)(1)(B).)

Here, with respect to the murder of Duarte and attempted murder of D.G., the jury found that the offense was committed for the offense for the benefit of a criminal street gang under section 186.22, subdivision (b). It also found that a principal personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (d) and (e)(1), causing great bodily injury or death to Duarte and D.G. Because this enhancement depends on a finding that the principal was "convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" as set forth in section 186.22, subdivision (b) (§ 12022.53, subd. (e)(1)(A)), the changes to section 186.22 made by Assembly Bill 333 require that the true findings on these enhancements be vacated as well and the matter remanded to the trial court.

We note, however, that with respect to the murder of Duarte and the attempted murder of D.G., the jury separately found true allegations under section 12022.53, subdivision (b), (c) and (d), the escalating firearm enhancements which did not involve gang-related activity. Accordingly, both appellants were sentenced to consecutive terms of 25-years-to-life under section

28

12022.53, subdivision (d) for personally and intentionally discharging a firearm and proximately causing injury and death in the murder and attempted murder.  Although we vacate the findings made under section 12022.53, subdivision (e)(1), those findings under section 12022.53, subdivision (b), (c), and (d), which carry the same penalty, remain intact.

## DISPOSITION

The convictions and non-gang-related firearm findings are affirmed.  The gang enhancement findings under section 186.22, and the gang-related firearm enhancement findings under section 12022.53, subdivision (e)(1) are vacated and remanded for retrial, at the election of the People.

The trial court is directed to correct Perez's abstract of judgment to delete the reference to murder in count 1 and add the attempted murder conviction in count 2.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

GRIMES, J.

WILEY, J.

29